1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

ROBERTA E. JACKSON,

11

Plaintiff,

12

v.

13

JO ANNE B. BARNHART, Commissioner of
Social Security,

14

15

Defendant.

16

CASE NO.     C05-5483KLS

ORDER AFFIRMING THE
COMMISSIONER'S DECISION
TO DENY BENEFITS

17

18

Plaintiff, Roberta E. Jackson, has brought this matter for judicial review of the denial of her

19

application for disability insurance benefits.  The parties have consented to have this matter be heard by the

20

undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and

21

Local Magistrates Rule 13.  After reviewing the parties' briefs and the remaining record, the undersigned

22

hereby finds and ORDERS as follows:

23

FACTUAL AND PROCEDURAL HISTORY

24

Plaintiff currently is thirty-four years old.[1] Tr. 38.  She has a general equivalency diploma and past

25

work experience as a janitor and nurse's aide/personal care attendant. Tr. 68, 73, 80, 342.

26

On August 30, 2001, plaintiff filed an application for disability insurance benefits, alleging disability

27

28

_____

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

as of October 15, 1999, due to knee problems. Tr. 18, 62, 67.  Her application was denied initially and on

reconsideration. Tr. 38-40, 45.  A hearing was held before an administrative law judge ("ALJ"), at which

plaintiff amended her application to allege disability for only a closed period of time beginning October 15,

1999, and ending June 30, 2002. Tr. 18, 29.  On November 13, 2002, the ALJ issued a decision, finding

that plaintiff was not disabled during the closed period, but that thereafter she was able to return to her past

relevant work due to medical improvement. Tr. 18, 32-34.

Plaintiff filed a second application for disability insurance benefits on February 11, 2003, alleging

disability as of July 1, 2002, again due to knee problems. Tr. 18, 219, 230.  Her application was denied

initially and on reconsideration. Tr. 193-95, 200.  Plaintiff requested a hearing, which was held before the

same ALJ on August 24, 2004. Tr. 332.  At the hearing, plaintiff, represented by counsel, appeared and

testified, as did a vocational expert. Tr. 332-46.  On October 29, 2004, the ALJ issued another decision,

determining plaintiff to be not disabled, finding specifically in relevant part:

> (1)   at step one of the disability evaluation process, plaintiff had not engaged in
> substantial gainful activity;
>
> (2)   at step two, plaintiff had "severe" impairments consisting of "status post left
> lower extremity surgery x2 resulting in chronic pain and obesity";
>
> (3)   at step three, none of plaintiff's impairments met or equaled the criteria of any of
> those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;
>
> (4)   at step four, plaintiff had the residual functional capacity to perform a modified
> range of sedentary work, which precluded her from returning to her past relevant
> work; and
>
> (5)   at step five, plaintiff was capable of performing other jobs existing in significant
> numbers in the national economy.

Tr. 23-24.  Plaintiff's request for review was denied by the Appeals Council on May 26, 2005, making the

ALJ's decision the Commissioner's final decision. Tr. 7; 20 C.F.R. § 404.981.

On July 20, 2005, plaintiff filed a complaint in this court seeking review of the ALJ's decision. (Dkt.

#1).  Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits

for the following reasons:

> (a)   the ALJ erred in rejecting the opinion of Dr. Jon E. Kretzler, plaintiff's treating
> physician;
>
> (b)   the ALJ erred in evaluating plaintiff's credibility;
>
> (c)   the ALJ erred in assessing plaintiff's residual functional capacity; and

1

2
    (d)    the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

3 For the reasons set forth below, however, the undersigned finds the ALJ did not err in determining plaintiff

4 to be not disabled, and therefore affirms the ALJ's decision.

5 <u>DISCUSSION</u>

6       This court must uphold the Commissioner's determination that plaintiff is not disabled if the

7 Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to

8 support the decision. <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is

9 such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson</u>

10 <u>v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than

11 a scintilla but less than a preponderance. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir.

12 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than

13 one rational interpretation, the court must uphold the Commissioner's decision. <u>Allen v. Heckler</u>, 749 F.2d

14 577, 579 (9th Cir. 1984).

15 I.    <u>The ALJ Did Not Err in Rejecting the Opinion of Dr. Kretzler</u>

16       The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

17 medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the

18 record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

19 ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must

20 be upheld." <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595, 601 (9th Cir.

21 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact

22 inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

23 "falls within this responsibility." <u>Id.</u> at 603.

24       In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

25 supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725. The ALJ can do this "by setting out a

26 detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

27 thereof, and making findings." <u>Id.</u> The ALJ also may draw inferences "logically flowing from the evidence."

28 <u>Sample</u>, 694 F.2d at 642. Further, the court itself may draw "specific and legitimate inferences from the

1   ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

2       The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

3   either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

4   treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

5   legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the

6   ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739

7   F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain

8   why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07

9   (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

10      In general, more weight is given to a treating physician's opinion than to the opinions of those who

11  do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

12  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or

13  "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190,

14  1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242

15  F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

16  opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A nonexamining physician's opinion may

17  constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-

18  31; Tonapetyan, 242 F.3d at 1149.

19      In response to a letter sent to him by plaintiff's counsel on August 28, 2003, Dr. Kretzler checked

20  "yes" in answer to the question as to whether plaintiff "would need to stretch and elevate her left leg on a

21  basis greater than what would be allowed on normal breaks during an eight-hour work day (i.e., 10-min

22  morning break, 30-min lunch, 10-min afternoon break)." Tr. 310.  Dr. Kretzler further stated that he based

23  his finding on the fact that plaintiff had "known degenerative arthritis" in her left knee. Id.  With respect to

24  Dr. Kretzler's medical findings and opinion, the ALJ found as follows:

25      Dr. Kretzler only noted limitations with prolonged standing, walking and lifting . . . Dr.
        Kretzler also opined the claimant would need to elevate her left lower extremity more
26      than normal . . . However, this opinion is not supported by his own treatment records
        wherein his numerous examinations of the left lower extremity failed to reveal any
27      swelling or effusion.  Further, Dr. Kretzler fails to provide any rationale behind this
        opinion and such appears to be based on the claimant's subjective complaints of swelling
28      instead of the objective finding of no swelling.  Given the rather benign findings upon
        repeated examinations, the Administrative Law Judge has accorded this part of Dr.

Kretzler's opinion little weight.  The "opinion", if that, consists of a check mark on an attorney generated form letter.  Elsewhere, Dr. Kretzler seems to infer that claimant can perform sedentary work and notes that claimant has "known degenerative arthritis in the left knee".

Tr. 22 (internal footnote omitted).  Although plaintiff argues otherwise, the undersigned finds these stated reasons for rejecting Dr. Kretzler's opinion to be clear and convincing.

Plaintiff first argues the ALJ erred in finding Dr. Kretzler found no evidence of swelling or effusion in her left lower extremity.  While it is true that Dr. Kretzler found plaintiff's left knee showed "minimal" effusion in early August 2003 (Tr. 330), nowhere else in his treatment notes, which cover a period of more than 17 months, are significant objective findings concerning left knee swelling or effusion mentioned (see Tr. 170, 175-76, 283-84).  Indeed, the fact that Dr. Kretzler found at most only "minimal" effusion one time in early August 2003, hardly supports his opinion that plaintiff needed to stretch and elevate her left leg to the extent and frequency alleged.  Plaintiff further argues Dr. Kretzler's observations are not made "on anywhere near a daily basis," and therefore should not be used to document the frequency or intensity of her knee effusion. Plaintiff's Opening Brief, p. 8.

Plaintiff, however, points to no other objective medical evidence in the record, and the undersigned can find none, that indicates the presence of significant left knee effusion or swelling.  In addition, the fact that Dr. Kretzler found plaintiff had a medically determinable impairment (i.e., degenerative arthritis of her left knee), is not in itself sufficient to establish disability.  Rather, plaintiff must show that the impairment results in such significant limitations that she is unable to work.  Plaintiff asserts her degenerative arthritis does account for her limitations, but Dr. Kretzler's treatment notes simply do not support that assertion.  See Tr. 170, 175-76, 283-84).  Indeed, while plaintiff initially reported swelling, pain and tightness in her left knee, those symptoms appeared to significantly improve over time. See id.

Plaintiff argues the ALJ improperly substituted his own opinion for that of Dr. Kretzler in giving Dr. Kretzler's opinion little weight. See Gonzalez Perez v. Secretary of Health and Human Services, 812 F.2d 747, 749 (1st Cir. 1987) (ALJ may not substitute own opinion for findings and opinion of physician); McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2nd Cir. 1983) (ALJ cannot arbitrarily substitute own judgment for competent medical opinion); Gober v. Mathews, 574 F.2d 772, 777 (3rd Cir. 1978) (ALJ not free to set own expertise against that of physician who testified before him).  Here, however, the ALJ did not do so.  Rather, the ALJ merely acted within his authority to determine credibility

1  and resolve ambiguities and conflicts in the medical evidence in the record in finding little in the way of

2  objective findings to support Dr. Kretzler's opinion. Reddick, 157 F.3d at 722; Sample, 694 F.2d 639 at

3  642; Morgan, 169 F.3d at 601.

4      Plaintiff's argument that the ALJ appeared to "degrade" Dr. Kretzler's opinion because it was

5  solicited by her counsel also is without merit.  It is true that absent "evidence of actual improprieties," the

6  purpose for which a medical report is obtained is not a legitimate basis for rejecting it. See Lester, 81 F.3d

7  at 832 ("An examining doctor's findings are entitled to no less weight when the examination is procured by

8  the claimant than when it is obtained by the Commissioner.").  Here, however, although the ALJ did note

9  that the opinion was obtained on "an attorney generated form letter" (Tr. 22), it does not appear the ALJ

10  rejected Dr. Kretzler's opinion for this reason.  Instead, the ALJ noted that the opinion consisted merely of

11  a "check mark," which is a proper consideration. See Murray v. Heckler, 722 F.2d 499, 501 (9th Cir.1983)

12  (expressing preference for individualized medical opinions over check-off reports).

13  II.     The ALJ Properly Evaluated Plaintiff's Credibility

14      Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

15  639, 642 (9th Cir. 1982).  The court should not "second-guess" this credibility determination.  Allen, 749

16  F.2d at 580.  In addition, the court may not reverse a credibility determination where that determination is

17  based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

18  claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long

19  as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th

20  Cir. 2001).

21      To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

22  disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify

23  what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v.

24  Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering,

25  the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at

26  834.  The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811,

27  818 (8th Cir. 2003).

28      In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

The ALJ discounted plaintiff's credibility in part because her allegations of disability were not consistent with the objective medical evidence in the record. Tr. 22-23. A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998). As discussed above, the ALJ did not err in rejecting Dr. Kretzler's opinion that plaintiff needed to stretch and elevate her leg to an extent greater than would be allowed by normal work breaks. The ALJ further found that the remaining reliable objective medical evidence in the record also supported a finding that plaintiff was capable of performing a modified range of sedentary work. Tr. 22-23. As plaintiff has not challenged the ALJ's findings regarding that evidence, the undersigned finds this reason to be clear and convincing.

The ALJ also discounted plaintiff's credibility in part because she was not using any "assistive devices." Tr. 23. While it is true, as plaintiff asserts, that she testified she had been using a knee brace since at least 1995 or 1996 (Tr. 339), there appears to be little in the way of other evidence in the record to support that testimony. For example, there is little evidence in plaintiff's treatment and examination notes from the years 1997 through 2004, to indicate she had been prescribed or was using any assistive device. See Tr. 112-13, 125-36, 138-39, 154, 157-61, 164-67, 179-80, 304-09, 312-13, 320-21. Nor does it appear that Dr. Kretzler prescribed such a device for her or found she was using one. See Tr. 170, 175-76, 283-84, 310, 330. Indeed, the only mention of plaintiff's use of a knee brace in the medical evidence in the record is a late November 2002 statement from her physical therapist indicating that she was benefitting from its use, but that she had not yet purchased one for herself. Tr. 292.

The ALJ further discounted plaintiff's credibility in part because she was "raising two children ages 4 and 9" and performed "all household duties" for a family of four. Tr. 23. To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many

1  home activities may not be easily transferable to a work environment." Id.   Plaintiff argues this is not a

2  valid reason for discounting her credibility, due to the "very limited fashion" in which she performed her

3  household chores. Plaintiff's Opening Brief, p. 13.

4      While it is true plaintiff testified and reported that she could perform her activities of daily living for

5  only limited periods of time and with frequent breaks (Tr. 88-90, 243-45), other evidence in the record

6  indicates she was more active than she alleged.  For example, when she applied for disability insurance

7  benefits plaintiff reported that she did yard work and other household chores such as doing the laundry and

8  dishes, cleaning, cooking for five people, taking care of her children, going grocery shopping three times a

9  week, and taking at least one of her children to school. Tr. 88-89, 94, 243-44.  She further stated she was

10  active in the life of at least one of her children, and that she could drive for one hour at a time. Tr. 90, 245.

11  In late December 2000, plaintiff also reported that she was helping to "raise her father-in-law as well as two

12  children." Tr. 164.  Thus, although the evidence regarding the extent of plaintiff's ability to engage in her

13  activities of daily living is conflicting, the court must abide by the ALJ's credibility determination in such

14  situations. See Allen, 749 F.2d at 579 (court may not reverse credibility determination where that

15  determination is based on contradictory or ambiguous evidence).

16      The ALJ next discounted plaintiff's credibility in part because she stopped working due to being

17  pregnant, rather than as the result of any medically determinable impairment. Tr. 23.  Plaintiff argues that

18  while she stopped working in 1994 because she was pregnant, she went back to work in 1999. Plaintiff's

19  Opening Brief, p. 13; Tr. 338.  Plaintiff further testified, however, that she did not try going back to work

20  after her second child was born in 2000. Tr. 338.  The undersigned, therefore, cannot fault the ALJ for

21  finding plaintiff stopped working for reasons other than because she was unable to work due to a medically

22  determinable impairment.

23      Lastly, the ALJ discounted plaintiff's credibility in part because she did "little to improve her

24  condition" and because she perceived herself as disabled. Tr. 23.  Failure to assert a good reason for not

25  seeking or following a prescribed course of treatment, or a finding that a proffered reason is not believable,

26  "can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th

27  Cir. 1989); see also Meanal v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly considered

28  physician's failure to prescribe, and claimant's failure to request serious medical treatment for supposedly

excruciating pain); <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ properly found prescription

for conservative treatment only suggestive of lower level of pain and functional limitation).

Plaintiff argues this reason is not clear and convincing, because she received a series of injections, pursued physical therapy, performed home exercises, and took prescribed medication.  The undersigned agrees the evidence in the record does not support the ALJ's finding on this issue, as it appears plaintiff for the most part did follow-up with her recommended treatment. <u>See</u> Tr. 125-26, 175-76, 179, 283, 292-97, 312, 330.  Nevertheless, the fact that one of the reasons for discounting plaintiff's credibility was improper, does not render the ALJ's credibility determination invalid, as long as that determination is supported by substantial evidence in the record, as it is in this case. <u>Tonapetyan</u>, 242 F.3d at 1148.

III.    The ALJ Properly Assessed Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. <u>Id.</u> Residual functional capacity thus is what the claimant "can still do despite his or her limitations." <u>Id.</u>

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. <u>Id.</u>  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." <u>Id.</u>  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." <u>Id.</u>  In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." <u>Id.</u> at *7.

The ALJ assessed plaintiff with the following residual functional capacity:

> [T]he claimant retains the residual functional capacity to engage in at least sedentary exertion.  She should not work at unprotected heights, should not drive and can only occasionally crouch, stoop or bend.  She should not climb stairs, ladders or ramps.  She requires the ability to elevate her left lower leg every two hours for fifteen minutes.

Tr. 23.  Plaintiff argues that this residual functional capacity assessment is inconsistent with her testimony regarding her limitations.  As discussed above, however, the ALJ properly discredited her credibility.

ORDER
Page - 9

1    Plaintiff further asserts that the ALJ's assessment of her residual functional capacity is not supported by the

2    substantial evidence in the record.  Also as discussed above though, the medical evidence in the record does

3    not support the degree of limitation plaintiff alleges she has.  Accordingly, the undersigned finds the ALJ did

4    not err in assessing plaintiff with the above residual functional capacity.

5    IV.    The ALJ's Step Five Analysis Was Proper

6          If the claimant cannot perform his or her past relevant work at step four of the disability evaluation

7    process, at step five, the ALJ must show there are a significant number of jobs in the national economy the

8    claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520(d)-

9    (e).  There are two ways that the ALJ can to this: "(a) by the testimony of a vocational expert, *or* (b) by

10   reference to the [Commissioner's] Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2"

11   (the "Grids"). Tackett, 180 F.3d at 1100-1101 (emphasis in original); see also Osenbrock v. Apfel, 240 F.3d

12   1157, 1162 (9th Cir. 2001).  The ALJ's ability to rely on the Grids is limited, however, as noted by the Ninth

13   Circuit in describing their purpose and function:

14          In some cases, it is appropriate for the ALJ to rely on the Medical-Vocational Guidelines
            to determine whether a claimant can perform some work that exists in "significant
15          numbers" in the national economy.  The Medical-Vocational Guidelines are a matrix
            system for handling claims that involve substantially uniform levels of impairment. . . .
16
            The Guidelines present, in *table form*, a short-hand method for determining the
17          availability and numbers of suitable jobs for a claimant.  These tables are commonly
            known as "the grids."  The grids categorize jobs by their physical-exertional
18          requirements and consist of three separate tables-one for each category: "[m]aximum
            sustained work capacity limited to sedentary work," "[m]aximum sustained work
19          capacity limited to light work," and "[m]aximum sustained work capacity limited to
            medium work."[2] . . . Each grid presents various combinations of factors relevant to a
20          claimant's ability to find work.  The factors in the grids are the claimant's age, education,
            and work experience.  For each combination of these factors, . . . the grids direct a
21          finding of either "disabled" or "not disabled" based on the number of jobs in the national
            economy in that category of physical-exertional requirements.
22
            This approach allows the Commissioner to streamline the administrative process and
23          encourages uniform treatment of claims. . . .

24          The Commissioner's need for efficiency justifies use of the grids at step five where they
            *completely and accurately* represent a claimant's limitations. . . . In other words, a
25          claimant must be able to perform the full range of jobs in a given category, i.e.,
            sedentary work, light work, or medium work.
26
     Tackett, 180 F.3d at 1101 (emphasis in original) (internal citations and footnote omitted).
27

28          [2]However, "[I]f a claimant is found able to work the full range of heavy work this is 'generally sufficient for a finding
     of not disabled.'" Tackett, 180 F.3d at 1101 n.5 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 204.00).

1    If, on the other hand, a claimant has "significant non-exertional impairments," those impairments

2  "may make reliance on the grids inappropriate."[3] Id. at 1101-02; see also Osenbrock, 240 F.3d at 1162

3  (ALJ cannot rely on Grids where claimant has significant non-exertional impairments); Moore v. Apfel, 216

4  F.3d 864, 869 (9th Cir. 2000) (Grids inapplicable when they do not completely describe claimant's abilities

5  and limitations).  Proper use of the Grids depends in each case upon the nature and extent of the claimant's

6  impairments and limitations:

7          The ALJ must apply the grids if a claimant suffers only from an exertional impairment .
8          . . In such cases, the rule is simple: the grids provide the answer.  Where the grids
           dictate a finding of disability, the claimant is eligible for benefits; where the grids
           indicate that the claimant is not disabled, benefits may not be awarded.  However,
9          where a claimant suffers solely from a nonexertional impairment . . . the grids do not
           resolve the disability question . . . other testimony is required.  In cases where the
10         claimant suffers from both exertional and nonexertional impairments, the situation is
           more complicated.  First, the grids must be consulted to determine whether a finding of
11         disability can be based on the exertional impairments alone. . . . If so, then benefits must
           be awarded.  However, if the exertional impairments alone are insufficient to direct a
12         conclusion of disability, then further evidence and analysis are required.  In such cases,
           the ALJ must use the grids as a "framework for consideration of how much the
13         individual's work capability is further diminished in terms of any types of jobs that
           would be contraindicated by the nonexertional limitations." . . . In short, the grids serve
14         as a ceiling and the ALJ must examine independently the additional adverse
           consequences resulting from the nonexertionary impairment.

15  Cooper v. Sullivan, 880 F.2d 1152, 1155-56 (9th Cir. 1989) (internal citations and footnotes omitted).

16    In his decision, the ALJ stated that given plaintiff's "vocational profile in conjunction with her

17  residual functional capacity, a finding of not disabled" was "reached within the framework of" Grid Rule

18  201.21. Tr. 23.  The ALJ further stated that "[i]n light of the vocational expert testimony," plaintiff retained

19  "the capacity to make a vocational adjustment to jobs that exist in significant numbers in the national

20  economy," and that therefore she was not disabled. Id.  Plaintiff argues the ALJ's determination in this

21  regard is erroneous, because he failed to elicit testimony from the vocational expert as to what specific jobs

22  would be available for plaintiff to perform and how many such jobs existed in the national economy.  As

23  such, plaintiff asserts, the ALJ had no support for his finding.  The undersigned disagrees.

24    When all of the criteria of a Grid rule is met, the existence of a significant number of jobs in the

25  national economy is established. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(b).  In addition, if a person

26

27

28         [3]"Exertional limitations" are those that only affect the claimant's "ability to meet the strength demands of jobs." 20
       C.F.R. § 404.1569a(b).  "Nonexertional limitations" only affect the claimant's "ability to meet the demands of jobs other than the
       strength demands." 20 C.F.R. § 404.1569a(c)(1).

1    is capable of stooping, kneeling, crouching and crawling on at least an occasional basis, "the sedentary and

2    light occupational base is virtually intact." SSR 85-15, 1985 WL 56857 *7. Pursuant to Grid Rule 201.21,

3    a claimant who is limited to sedentary work, is a younger individual, has a high school or higher education,

4    and whose previous work experience is skilled or semi-skilled, is deemed to be not disabled.[4] 20 C.F.R. Pt.

5    404, Subpt. P, App. 2, § 201.21.

6         In light of the residual functional capacity with which the ALJ assessed plaintiff, it appears plaintiff

7    falls within the framework of the Grids. That is, it seems that plaintiff's ability to perform a wide range of

8    sedentary work has remained largely intact. In addition, the vocational expert testified that given the ALJ's

9    residual functional capacity assessment, plaintiff would be capable of performing several categories of jobs

10   classified as sedentary, unskilled work. Tr. 343. Accordingly, the undersigned finds the ALJ did not have to

11   elicit testimony from the vocational expert concerning specific numbers of jobs, and therefore did not err in

12   determining plaintiff to be not disabled at step five of the disability evaluation process.

<u>CONCLUSION</u>

14        Based on the foregoing discussion, the court finds the ALJ properly determined plaintiff was not

15   disabled. Accordingly, the ALJ's decision hereby is AFFIRMED.

16        DATED this 13th day of March, 2006.

Karen L. Strombom
United States Magistrate Judge

---

[4]Given plaintiff's actual age at the time of the ALJ's decision, it seems that the appropriate Grid rule to consider here is actually 20 C.F.R. Part 404, Subpart P, Appendix 2, § 201.27. However, the differences between those two rules is not relevant to the outcome of this case.